IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BIMAL ENTERPRISES, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 09-3654 |
| | : | |
| LEHIGH GAS CORPORATION | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                            **September 28, 2012**

Plaintiff Bimal Enterprises, Inc. (BEI) asks this Court to declare that Defendant Lehigh Gas

Corporation (Lehigh) violated the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801

et seq., by improperly terminating BEI's Exxon gas station franchise in Upper Darby, Pennsylvania

in 2009.  Lehigh asserts several counterclaims and third-party claims against BEI, BEI owner Bimal

Patel, and BEI manager Manmeet Singh.  Specifically, Lehigh asserts claims for fraudulent

misrepresentation and conversion against BEI, Patel, and Singh; breach of contract and ejectment

against BEI and Patel; and indemnification and contribution against Patel.  This case proceeded to

a three-day non-jury trial commencing on April 25, 2011.  Pursuant to Federal Rule of Civil

Procedure 52(a), this Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

BEI is a Pennsylvania corporation owned and operated by Bimal Patel.  BEI operates a gas

station and convenience store under the trade name "State Road Exxon" at 1892 South State Road

in Upper Darby, Pennsylvania.  BEI operates State Road Exxon pursuant to a PMPA franchise

agreement with Lehigh (the Franchise Agreement).  Lehigh is authorized by ExxonMobil

Corporation to market motor fuel under the Exxon trademark, and Lehigh markets Exxon fuel

through independent Exxon franchisees, such as BEI.

Under the Franchise Agreement, BEI purchases Exxon motor fuel from Lehigh and resells it to consumers under the Exxon trademark.  The Franchise Agreement designates Patel as the "Key Individual," i.e., "the officer of the Franchise Dealer [here, BEI] with authority and responsibility for the operation and management of the Businesses [here, State Road Exxon]."  Ex. 1 (Franchise Agreement), at 4.3(b).

Prior to the events in 2009 which prompted Lehigh to issue a notice terminating BEI's franchise, BEI had operated State Road Exxon without incident since it purchased the franchise in 2004.  Lehigh's president, David Hrinak, admitted Lehigh had a good relationship with Patel and BEI prior to the spring of 2009.  Trial Tr. vol. 3, 30, Apr. 27, 2011.  State Road Exxon was one of Lehigh's highest volume dealers in its geographical area, and Lehigh officials viewed Patel as a good, competent dealer.  As a result of State Road Exxon's success, Lehigh offered BEI the opportunity to convert its convenience store into a Lehigh convenience franchise, which BEI declined to do.  Also, Lehigh solicited BEI, in 2008, to run a second gas station in Aston, Pennsylvania, as a Lehigh "commission marketer," with BEI selling Lehigh's fuel to consumers on a commission basis.  BEI operated this station under the trade name "Aston Exxon."

Since mid-2008, Patel has employed Manmeet Singh as the manager of State Road Exxon and Aston Exxon.  Patel relied on Singh for the day-to-day management of the stations.  Patel has other businesses to which he dedicates his time, and, consequently, has spent approximately 14 hours per week at State Road Exxon while Singh has been its manager.

In September 2008, Lehigh commenced a joint marketing promotion program with ACME supermarkets (ACME program) whereby ACME customers could earn coupons based on supermarket purchases and redeem them at participating Exxon stations for discounted gasoline.

Specifically, a coupon (or two combined coupons) would reduce a gasoline purchase by 5 to 70 cents per gallon.  The dealers would provide customers the discounted fuel, and Lehigh would reimburse the dealers for the amount of the discount. While the ACME program was voluntary for dealers, Lehigh strongly encouraged the program, and both State Road Exxon and Aston Exxon participated.

Lehigh implemented the ACME program quickly, and its execution and administration by Lehigh proved problematic.  On September 15, 2008, Lehigh held an introductory meeting with representatives of participating dealers, including Patel.  Lehigh gave a PowerPoint presentation and provided participants with a printout of the presentation to keep as a guide.  Dealers began accepting ACME program coupons only four days later.  Before the program commenced, however, Lehigh's territory managers, who generally act as liaisons between Lehigh and its dealers, needed to reprogram the computer systems controlling each dealer's cash registers and pumps.  James Rullo, the territory manager assigned to the area in which BEI's stations are located, lacked the time (and perhaps the expertise) to complete these upgrades before the ACME Program was to begin, so Patel, who has computer science training, and a BEI employee assisted Lehigh by upgrading the systems at the surrounding dealers as a favor.

Despite the upgrades, and unlike similar supermarket-rewards programs at other gas stations, the ACME program was not automated, and dealers had to manually keep track of the purchases in which coupons were used.  This responsibility included completing and submitting to Lehigh daily spreadsheets—termed "recap sheets"—cataloguing each purchase made with a coupon, the coupon serial number, the percentage discount, the number of gallons purchased, the number of gallons reimbursed, and the total amount for reimbursement.  Lehigh based its reimbursement payments to the dealers on the figures in the recap sheets.  For each transaction involving a coupon, the dealers

3

were also required to maintain the redeemed coupon attached to the receipt for weekly collection by a Lehigh territory manager.

This administrative work, especially completing the recap sheets, which had to be submitted to Lehigh by 11:00 a.m. the day after the coupon was used in order for the dealers to be reimbursed, became highly burdensome for BEI. Initially, Patel completed the recap sheets, which, within a few weeks, were taking over two hours a day to complete. In October 2008, Patel delegated the ACME program duties, including completing and submitting the recap sheets for both stations, to Singh, who had demonstrated his competence as a station manager. Patel trained Singh on the ACME program responsibilities for two weeks, after which Patel was satisfied Singh was capable of completing the tasks without supervision. Although from October 2008 forward, Singh was the sole BEI employee completing and submitting recap sheets to Lehigh, he would submit them from BEI's email account which contained an automatic signature line that read, "Thank You, Bimal," followed by Patel's cell phone number. *See* Ex. 54. In July 2009, after receiving complaints from dealers about the time-consuming nature of the ACME program record-keeping requirements, Lehigh amended the procedures and permitted dealers to submit daily recap sheets with one line summarizing the daily totals, rather than listing each transaction.

The administration of the ACME program was also overly burdensome for Lehigh's territory managers. For Rullo, collecting the coupons and receipts for the ACME program from each of the 35 to 40 participating dealers in his territory, while still performing his other duties, was virtually impossible. The large volume of the paper receipts Rullo collected posed a problem as well, and after Lehigh refused to allow Rullo to leave them at Lehigh's offices, simply finding space to store the receipts proved difficult. Although the purpose of collecting the receipts was to verify the

4

reimbursement amounts, Lehigh eventually gave Rullo permission to discard coupons he had collected even though the coupons had never been reviewed against the recap sheets. Rullo understood this to mean the receipts need not be kept by the dealers either, and instructed his dealers, including BEI, to discard the receipts.[1] On April 20, 2009, however, at the direction of his superiors, Rullo sent an email to his dealers informing them they were no longer permitted to discard the receipts, and that someone from Lehigh would be collecting them periodically.

In March 2009, representatives from ACME informed Lehigh's accounting department about an unusual increase in coupon redemptions at State Road Exxon and Aston Exxon. After reviewing the recap sheets and confirming the increase, on or about April 8, 2009, Peter Waldron, Lehigh's Vice President of Marketing, visited State Road Exxon and Aston Exxon and collected the ACME program receipts and coupons that had not yet been discarded. Lehigh then compared those receipts and receipts collected thereafter with the recap sheets submitted by BEI. Lehigh determined from March 1 to April 30, 2009, it had overcompensated BEI $9,455.19 in reimbursements for State Road Exxon ACME program sales based on recap sheets which overstated the amounts of gasoline actually sold. Lehigh also found from February 25 to April 30, 2009, the recap sheets for Aston Exxon similarly overstated the amounts of gasoline actually sold, resulting in $10,625.00 of overcompensation. Each of these recap sheets Lehigh reviewed listed the amount of gasoline sold for virtually all of the transactions as above 15 gallons, which was the maximum volume for which an ACME coupon could be redeemed. A similar pattern could be seen in the recap sheets for both

---

[1] The Lehigh officials who testified at trial contend they never instructed or permitted Rullo to inform dealers they could discard receipts. In any event, whether Lehigh so instructed Rullo is irrelevant because the record firmly establishes Rullo, who served as the primary liaison between Lehigh and the dealers in his territory, directed his dealers to discard the receipts.

stations submitted since mid-December 2008, but Lehigh could not determine if BEI had been over-reimbursed during this earlier period.

At no time did Lehigh ask Patel or any BEI employee about the inconsistencies between the receipts and the recap sheets, nor did anyone at Lehigh who testified at trial even contemplate raising the matter with Patel.  Rather, Lehigh responded to these findings by ceasing to issue ACME program reimbursements to BEI as of April 17, 2009, and by bringing the matter to the Delaware County District Attorney's Criminal Investigative Division (CID).

Meanwhile, on Saturday, April 25, 2009, Patel discovered Lehigh was no longer receiving ACME program reimbursements.  On April 28, after Patel had asked Singh if he knew why the reimbursements were not being issued, Singh informed Patel he had not been entering accurate gallon amounts into the recap sheets.  Singh explained he believed this practice was appropriate because, for some time, he had been directed by Lehigh simply to discard the coupons and receipts. Patel had not known Singh was submitting inaccurate recap sheets, and upon so learning, he immediately reprimanded Singh and made clear Singh must only submit correct numbers going forward. This Court finds credible Patel's testimony he was unaware Singh was inaccurately completing the recap sheets until Singh informed him on April 28, 2009.  This is corroborated by the credible testimony of Singh, who made such statements against his penal interests.

Later that same day, Detective Thomas Scarpato, Jr., of Delaware County CID arrived at State Road Exxon to execute a search warrant in the investigation regarding the inaccurate recap sheets.  Patel voluntarily followed Detective Scarpato back to CID's offices and provided an interview, which was memorialized in a document containing Scarpato's questions and Patel's answers of "yes," "no," or a very brief statement. Ex. 28.  According to the document and Detective

6

Scarpato's testimony, Patel answered affirmatively when asked "did *you*" submit inaccurate recap sheets to Lehigh.  *Id.* at 3.  At trial, Patel credibly explained he did not intend to convey that he, personally, submitted incorrect recap sheets, but was explaining he was aware BEI had done so. Significantly, this Court notes English is not Patel's first language, and further notes he required the assistance of an interpreter at trial, but did not have such assistance during his interview with CID.

Detective Scarpato informed Lehigh that Patel had admitted to submitting the inaccurate recap sheets.[2]  Thereafter, on May 15, 2009, Lehigh hand delivered to Patel a notice of termination of BEI's PMPA franchise at State Road Exxon.[3]  The notice stated, in relevant part:

> The grounds for termination are as follows:
>
> > 1. Failure to comply with provisions of the franchise which are both reasonable and materially significant to the franchise relationship (§ 2802(b)(2)(A)[)]; and
> >
> > 2. The occurrence of a relevant event for which termination is reasonable (§ 2802(b)(2)(C)[)].  The relevant events include fraud or criminal misconduct (theft) relevant to the operation of the marketing premises, and knowing failure to comply with Federal, State, or local laws relevant to the operation of the marketing premises.
>
> In particular, we have been advised that you admitted to law enforcement personnel of the State of Pennsylvania that you have engaged in theft in connection with your operation of the marketing premises.

Ex. 32 (Termination Notice), at 1.

_____

[2] While this Court does not question Detective Scarpato's veracity in testifying about his interactions with Patel, it does not agree with his characterization that Patel admitted to personal involvement with the inaccurate recap sheets.  Rather, this Court finds as a fact Patel never admitted he knew about or participated in completing or submitting inaccurate recap sheets to Detective Scarpato or anyone else.

[3] Lehigh also terminated BEI's contract to operate Aston Exxon, but because that contract was not governed by the PMPA, the termination did not require written notice and is not a subject of this suit.

Patel attempted to persuade the Lehigh officials who delivered the termination notice to reconsider, informing them the inconsistencies resulted from a mistake by his employee and offering to repay whatever was owed to Lehigh.[4]  Lehigh did not oblige.  Nevertheless, in the remaining 90 days until the termination was to take effect, Lehigh allowed State Road Exxon to participate in the ACME program, a privilege Lehigh limited only to dealers "in good standing."  Ex. 10, at 6; Trial Tr. vol. 1, 186, Apr. 25, 2011.  In so doing, Lehigh was able to fully recoup from BEI the amount it could determine BEI was unduly reimbursed, $20,080.19.

On August 11, 2009, BEI filed the instant action alleging Lehigh had improperly terminated the State Road Exxon franchise in violation of the PMPA, with a corresponding motion to enjoin the termination pending resolution of this case, which this Court granted.  Lehigh filed various state law counterclaims against BEI and third-party claims against Patel and Singh.   The case proceeded to a non-jury trial on April 25, 2011.

**CONCLUSIONS OF LAW**

Congress enacted the PMPA to remedy the disproportionate bargaining power it found petroleum industry franchisors hold over franchisees, leading to the exploitation of franchisees. *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 587 (3d Cir. 1989) (citing S. Rep. No. 95-731 at 17 (1978),

---

[4] Kenneth Frye, the Lehigh territory manager who replaced Rullo, and Richard Portelli, a Lehigh area manager, delivered the notice of termination to Patel.  Frye and Portelli both testified Patel acknowledged he was aware of the inconsistencies of the recap sheets.  Frye testified Patel stated "you caught me," however this Court does not find this testimony credible as Portelli recalled no such admission.  Trial Tr. vol. 1, 267, Apr. 25, 2011.  Moreover, even if Patel had made such a statement, it would not alter this Court's finding that Patel, whose English is not perfect, consistently acknowledged the inaccurate recap sheets were submitted by Singh on behalf of BEI, but never admitted any personal involvement in their completion or submission.  Indeed, Frye and Portelli both recalled Patel explaining to them one of BEI's employees was responsible for the inaccurate recap sheets.

*reprinted in* 1978 U.S.C.C.A.N. 873, 875-77); *see also Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3d Cir. 1987) (explaining "the overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship").  Recognizing a franchisor's termination of the franchise is an "'extreme remedy,' Congress intended to restrict that remedy to contractual violations that are 'so serious as to undermine the entire relationship.'" *Chevron U.S.A. Inc. v. El-Khoury*, 285 F.3d 1159, 1163 (9th Cir. 2002) (quoting S. Rep. No. 95-731 at 18, *reprinted in* 1978 U.S.C.C.A.N. at 876).  In order to achieve these purposes, the PMPA limits the grounds on which franchisors may terminate or decline to renew a franchise and imposes specific notification requirements upon franchisors seeking to so end the franchise relationship.  15 U.S.C. § 2802(b)(1); *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 294 (3d Cir. 2008).  It also creates a private right of action for franchisees who have been subject to unlawful termination or nonrenewal of their franchise.  15 U.S.C. § 2805.

"[T]he default regime of the Act is that all terminations or nonrenewals are unlawful unless otherwise excepted." *Patel v. Sun Co., Inc.*, 141 F.3d 447, 453 (3d Cir. 1998).  Thus, BEI, as the franchisee, bears the initial burden of showing the franchise has been terminated, *see* 15 U.S.C. § 2805(c), a fact not in dispute.  The burden then shifts to Lehigh to establish as an affirmative defense (1) the termination is based on one of the statutorily prescribed grounds and (2) Lehigh satisfied the notice requirements.  *See* 15 U.S.C. § 2805(c); *see also O'Shea*, 886 F.2d at 597.

Under the PMPA, a notice of termination or non-renewal must contain "a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor." 15 U.S.C. § 2804(c)(3)(A).  "In order for the notice requirement to be meaningful, it must be the case that the franchisor, defending a PMPA action, not assert new reasons for the

9

termination in court; the defendant must establish that the termination was proper under the PMPA based on the reasons that it gave to the franchisee in the notice of termination." *O'Shea*, 886 F.2d at 597-98.

Lehigh's notice cites two PMPA-prescribed grounds for termination:  (1) BEI's failure to comply with provisions of the franchise which are both reasonable and materially significant to the franchise relationship, 15 U.S.C. § 2802(b)(2)(A); and (2) the occurrence of an event relevant to the franchise relationship as a result of which termination is reasonable, *id.* § 2802(b)(2)(C).[5]  The notice then provides the following statement supporting those statutory grounds for termination: "[i]n particular, we have been advised that you admitted to law enforcement personnel of the State of Pennsylvania that you have engaged in theft in connection with your operation of the marketing premises."  Termination Notice 1.

In this action, however, Lehigh argues termination is based on not simply Patel's admission to law enforcement he committed theft, but also Patel's or Singh's actual conduct of submitting inaccurate recap sheets, and Patel's failure to supervise Singh in submitting the recap sheets.  BEI contends these additional justifications cannot be relied upon now because they are new reasons not asserted in the notice of termination.  *See O'Shea*, 886 F.2d at 597-98; *N.I. Petroleum Ventures Corp. v. GleS, Inc.*, 333 F. Supp. 2d 251, 258 (D. Del. 2004) ("As the Third Circuit strictly construes the PMPA notice requirements, defendant may not rely upon grounds for nonrenewal which are not disclosed in its . . . notice[] of nonrenewal.").

---

[5] Lehigh's citation to § 2802(b)(2)(C) in its notice of termination also refers to two examples of events justifying termination that are expressly mentioned in the statute: (1) "fraud or criminal misconduct (theft) relevant to the operation of the marketing premises, [§ 2802(c)(1)]"; and (2) "knowing failure to comply with Federal, State or local laws relevant to the operation of the marketing premises [§ 2802(c)(11)]."  Termination Notice 1.

Despite the notice's seeming reliance on Patel's admission of a crime as the reason for termination, BEI clearly understood the termination was predicated on the inaccuracies in the ACME program recap sheets.  Regardless of whether Patel admitted to Delaware County CID he committed theft, he knew CID's investigation focused on the recap sheets.  Also, the Lehigh officials who delivered the termination notice to Patel explained to him the recap sheets were the basis for the termination.  *See O'Shea*, 886 F.2d at 598 (considering facts known to dealer but not contained in termination notice in holding notice sufficiently apprised dealer of reason for termination under § 2804(c)(3)(A)); *Dandy Oil, Inc. v. Knight Enters., Inc.*, 654 F. Supp. 1265, 1270 (E.D. Mich. 1987) (same).

It was not clear from the notice or the relevant circumstances, however, that the reasons for termination included Patel's alleged failure to supervise his employees, one of the defenses Lehigh now asserts.  The notice cites BEI's "failure to comply with provisions of the franchise," 15 U.S.C. § 2802(b)(2)(A), as a grounds for termination, but does not specify which franchise provisions BEI violated.  Lehigh now avers BEI failed to comply with the following provisions of the Franchise Agreement:

> (1) paragraph 4.2(c), requiring Patel, as the Key Individual, to devote good-faith and best efforts to the day-to-day operation and management of the business;

> (2) paragraph 8.1(a), requiring Patel to use sound business practices and maintain high standards of retail service-station operations;

> (3) paragraph 8.1(b), requiring all BEI managers to be qualified and experienced in operating the business, attend trainings, and have authority to act on behalf of BEI in conducting day-to-day business;

11

(4) paragraph 9.9, requiring BEI to operate and maintain the business in compliance with all applicable laws, including those concerning the environment, hazardous substances, and occupational safety and health;

(5) paragraph 9.13(a), prohibiting BEI and its employees from engaging in conduct that (i) reflects unfavorably on the reputation of BEI, ExxonMobil, or Lehigh; (ii) impairs the goodwill associated with proprietary marks including conduct which jeopardizes BEI's good relations with customers or ExxonMobil's and/or Lehigh's relationship with its contractors or vendors; or (iii) constitutes a deceptive or unfair trade practice under applicable laws;

(6) paragraph 9.13(b), requiring BEI to cooperate and ensure its employees cooperate with Lehigh in the performance of BEI's franchise obligations or in the exercise of Lehigh's rights under the franchise; and

(7) paragraph 10.1, requiring BEI to comply with the requirements of all ExxonMobil and Lehigh marketing and promotional programs.

*See* Lehigh's Proposed Findings of Fact and Conclusions of Law 54-55, ECF No. 115 (citing Franchise Agreement).

As discussed above, the notice, in conjunction with the relevant circumstances known to Patel, sufficiently informed BEI the termination was based on the inaccurately reported sales figures for the ACME program. Although it would have been prudent for Lehigh to have cited the Franchise Agreement provisions BEI had purportedly breached, this Court is satisfied Lehigh's citation to § 2802(b)(2)(A) and reference to Patel's admission of theft adequately informed BEI the termination was predicated on BEI's failure to comply with the above-cited provisions insofar as those

provisions pertain to BEI's obligation to not steal from Lehigh or submit inaccurate figures for ACME program reimbursements. The notice, however, did not sufficiently apprise BEI the termination was based on these provisions insofar as they impose a duty on Patel, as BEI's Key Individual, to monitor and supervise BEI's managers. Neither the notice itself, nor the circumstances leading up to the notice should have made BEI aware the alleged inadequate supervision of Singh was a reason for the termination. Moreover, from Lehigh's perspective, Patel's supervision of Singh could not have been a reason to terminate the franchise as Lehigh was wholly unaware someone other than Patel had been submitting the recap sheets, or that Patel was so contending. Lehigh was ignorant to such facts because upon discovering the inconsistencies and before making a single inquiry to Patel, it concluded Patel had committed theft and brought its conclusion to local law enforcement agents. Lehigh cannot now argue the termination is based on Patel's failure to comply with franchise provisions requiring adequate supervision of managers; to hold otherwise would undermine the PMPA's intent that the notice requirement be "meaningful." *O'Shea*, 886 F.2d at 597-98; *see also N.I. Petroleum Ventures*, 333 F. Supp. 2d at 258 (noting Third Circuit law requires PMPA notice requirements be strictly construed); *Dandy Oil*, 654 F. Supp. at 1270 ("In general, franchisors must comply strictly with the notice provision." (citing *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1211 (7th Cir. 1984))).

Turning now to the substance of Lehigh's defenses, to establish a defense to unlawful termination pursuant to § 2802(b)(2)(A), Lehigh must demonstrate "[a] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." 15 U.S.C. § 2802(b)(2)(A). Such a "failure," however, does not include "any failure for a cause beyond the reasonable control of the franchisee." *Id.*

§ 2801(13)(B). Lehigh cites seven franchise provisions—listed above—BEI allegedly violated. These provisions can be reduced to a few general obligations or duties: (I) Patel's duty to adequately manage the business; (II) BEI and its employees' duty not to violate laws, deceive customers, or impair Lehigh or ExxonMobil's reputation; (III) BEI's duty to perform under the franchise agreement and not interfere with Lehigh's rights thereunder; (IV) BEI's obligation to hire qualified managers; and (V) BEI's duty to ensure its employees comply with all relevant franchise provisions, although the alleged breach of this duty has been found to be outside the scope of Lehigh's termination notice.

This Court finds Lehigh has not established Patel or BEI failed to comply with these obligations. Apart from this incident, BEI's history as a dealer is exemplary, and, by all accounts, Patel was a very capable and successful operator. Lehigh officials confirmed that prior to the spring of 2009, they viewed Patel as a quality operator and characterized Lehigh's relationship with BEI as good. Throughout its existence, State Road Exxon sold a high volume of ExxonMobil fuel. Its convenience store sales were impressive enough for Lehigh to offer BEI a franchise for that segment of the business as well. Furthermore, due to the success of State Road Exxon, Lehigh solicited BEI to open Aston Exxon pursuant to an arrangement in which Lehigh trusted BEI to sell its fuel on commission, rather than purchase fuel for resale to consumers as under the Franchise Agreement. *See Darling v. Mobil Oil Corp.*, 864 F.2d 981, 991 (2d Cir. 1989) (explaining "[a]ll relevant facts, including those occurring between the commencement of the franchise agreement and its purported termination, must be considered when scrutinizing the grounds for termination").

The only blemish in the franchise relationship was the relatively brief period in which Singh, without Patel's knowledge or direction, completed and submitted ACME program recap sheets

14

containing inaccurate sales information. Whether Singh intended to defraud Lehigh or merely chose a poor method to streamline the overly burdensome task of completing the recap sheets, his conduct was clearly "beyond the reasonable control" of BEI. 15 U.S.C. § 2801(13)(B). Patel reasonably delegated this task, a small component of State Road Exxon's business, to his manager, Singh, who had previously demonstrated his competence. For two weeks, Patel trained Singh on the burdensome, yet fairly straightforward task of completing the recap sheets. After assuring himself Singh was capable of performing this task without his supervision, Patel left Singh solely in charge of completing and submitting the recap sheets, along with the many other tasks Patel had delegated to Singh. Patel had no reason to suspect there was an issue with the ACME program until he noticed Lehigh had ceased making the ACME program reimbursements and inquired about the matter to Singh, who informed him about the misreporting. Patel immediately responded by ensuring the recap sheets were accurately completed going forward.

Lehigh argues *Baker v. Amoco Oil Company*, 761 F. Supp. 1386 (E.D. Wis. 1991), *aff'd*, 956 F.2d 639 (7th Cir. 1992), is instructive. There, the district court granted summary judgment in favor of the franchisor on Baker's PMPA unlawful termination claim, finding Baker had been manipulating fuel meter readings in order to obtain cheaper fuel, in breach of the franchise provision prohibiting the dealer or its employees from misrepresenting meter readings. *Id.* at 1396-97. Although Baker's employee/wife had conducted some of the manipulated readings, Baker himself admitted to actively participating in the conduct. *Id.* at 193-94; *see also Baker*, 956 F.2d at 642 (affirming the district court on the grounds "Baker conceded in his deposition that for years he had reported meter readings" misrepresenting the actual amounts). Here, in contrast, Patel had no knowledge or reason to suspect Singh was submitting inaccurate recap sheets. The instant case,

therefore, more closely resembles the situation presented in *Joy v. BP Products North America Inc.*, 332 F. Supp. 2d 1084 (N.D. Ill. 2004).  In *Joy*, the franchisor issued a notice of termination upon learning an employee of the dealer had been regularly selling drugs from the service station, in violation of a franchise provision prohibiting the dealer from selling drugs or permitting others to sell drugs on the business premises.  *Id.* at 1085.  Each morning, twenty to thirty high school students would congregate at the station to buy drugs from the employee.  *Id.*  Ultimately, the court granted the dealer a preliminary injunction because there was no evidence the dealer had any knowledge of the employee's conduct.  *Id.* at 1086.

Because Patel did not know or have reason to suspect the ACME program recap sheets were inaccurate, and because he reasonably delegated the recap sheet responsibilities to Singh, this Court finds Lehigh has failed to establish Patel violated any laws or breached his duty to properly manage the business.  Nor has Lehigh established Patel or BEI deceived customers or caused harm to Lehigh's or ExxonMobile's reputation.  Any failure by BEI to perform under the franchise agreement or ACME marketing program, or otherwise comply with the cited franchise provisions, was beyond its reasonable control.  Furthermore, although Lehigh's allegation of inadequate supervision is outside the scope of the termination notice, this Court also finds Lehigh has failed to establish supervision of Singh was inadequate.  Patel reasonably delegated the ACME reporting duties to Singh, who had proved capable of the task.  Had there been some indication the recap sheets were inaccurate, perhaps then Patel's obligations under the Franchise Agreement would have required him to compare the recap sheets with the receipts before Singh submitted them to Lehigh.  But the record shows no such red flags, and Lehigh never once asked Patel about the apparent inconsistencies. Lastly, insofar as Lehigh contends Patel's promoting Singh to manager was a breach of the franchise

agreement, this Court finds there was no such breach.[6]   Lehigh thus has not demonstrated § 2802(b)(2)(A) grounds for terminating BEI's franchise.

To establish grounds for termination pursuant to 15 U.S.C. § 2802(b)(2)(C), Lehigh must show "[t]he occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable."   Subsection 2802(c) sets forth a nonexclusive list of events justifying termination under § 2802(b)(2)(C).   *See id.* § 2802(c)(1)-(12).   Where a termination pursuant to § 2802(b)(2)(C) is based on franchisee misconduct, whether under an enumerated § 2802(c) event or not, courts must analyze the termination decision for reasonableness. *Patel*, 141 F.3d at 459 (holding the PMPA "generally contemplates an objective reasonableness inquiry into terminations and nonrenewals based upon franchisee misconduct"); *Sun Ref. & Mktg. Co. v. Rago*, 741 F.2d 670, 673 (3d Cir. 1984) (holding the occurrence of an enumerated § 2802(c) event is not a per se reasonable grounds for termination).

Lehigh asserts two enumerated events occurred here:  (1) "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises," 15 U.S.C. § 2802(c)(1); and (2) "knowing failure of the franchisee to comply with Federal, State, or local laws or regulations relevant to the operation of the marketing premises," *id.* § 2802(c)(11).   Lehigh further argues termination is reasonable even if the relevant event does not fall within the nonexclusive list of § 2802(c).   *See Glenside W. Corp. v. Exxon Co., U.S.A.*, 761 F. Supp. 1118, 1130 (D.N.J. 1991) (holding event justified termination pursuant to § 2802(b)(2)(C) even if it was not within § 2802(c)(1)-(12)); *Portaluppi v. Shell Oil Co.*, 684 F. Supp. 900, 905-06 (E.D. Va. 1988) (same).

---

[6] Lehigh does not seem to argue a reason for the termination is BEI's hiring of an unqualified manager, although it did cite to the related franchise provision as having been breached.

As this Court has already found, Lehigh has not established Patel knowingly misreported the ACME program sales.  This Court has also held any failure to comply with laws relevant to the operation of State Road Exxon was beyond the reasonable control of BEI.  *See* 15 U.S.C. § 2801(13)(B) (defining "failure" for purposes of § 2802 as not including "any failure for a cause beyond the reasonable control of the franchisee").  *Compare Joy*, 332 F. Supp. 2d at 1086 (granting franchisee preliminary injunction against termination pursuant to § 2802(b)(2)(C), based on drug sales on the business premises by franchisee's employee, because there was no evidence franchisee had any knowledge of sales), *with Nassau Blvd. Shell Serv. Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 364 (2d Cir. 1989) (affirming denial of franchisee's motion for preliminary injunction where termination pursuant to § 2802(c)(1) and (11) was based on franchisee owner-operator's admission of credit card fraud), *and Rising Micro, L.L.C., v. Exxon Mobil Oil Corp.*, No. 06-572, 2006 WL 1193839, at *6 (D.D.C. May 3, 2006) (denying franchisee preliminary injunction where franchisor terminated pursuant to § 2802(c)(1) and (12) because franchisee's "key individual" pleaded guilty to credit card fraud relating to operation of the business).

Lehigh contends, however, even if Patel was unaware of Singh's inaccurate reporting, Singh's fraudulent conduct should be imputed to BEI because he was authorized by BEI to submit the recap sheets.  But imputing Singh's failure to comply with the law to BEI even though such noncompliance was beyond BEI's reasonable control would vitiate § 2801(13)(B)'s limitation, which is a "legislated excuse" for noncompliance.  *Rago*, 741 F.2d at 673 (quoting *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1224 n.16 (7th Cir. 1982)).   Lehigh, therefore, has not established a defense under § 2802(c)(11).

Section 2802(c)(1)—"fraud or criminal misconduct by the franchisee relevant to the

operation of the marketing premises"—unlike § 2802(c)(11), does not contain the word "failure" and thus the "beyond the reasonable control" limitation may not literally apply.  These two grounds for termination as asserted by Lehigh, however, are essentially the same, and this Court sees no reason to treat them differently.  Lehigh has failed to demonstrate Patel, BEI's Key Individual, had any part in the inaccurate recap sheets, or that BEI breached any duty in its supervision of Singh.  Given the "major thrust" of the PMPA is to protect franchisees, *Rago*, 741 F.2d at 673, this Court finds it unreasonable to terminate BEI's franchise based on Singh's conduct without "some showing of culpability" by BEI, *Joy*, 332 F. Supp. 2d at 1086.

Examining other § 2802(c) events supports the conclusion that franchisee misconduct triggering termination must involve not simply an agent of the dealer, but the actual franchisee, or the individual with ultimate control where the franchisee is a business entity.  For example, § 2802(c)(12) makes the "conviction of the franchisee of any felony involving moral turpitude" an event justifying termination.  Although this subsection does not technically invoke the "beyond the reasonable control" limitation, permitting termination simply because a franchisee's employee committed a crime of moral turpitude would produce an absurd result inconsistent with the purposes of the PMPA.  *See e.g.*, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").  Thus, even if Singh has committed fraud or criminal conduct, Lehigh still has not established the occurrence of a § 2802(c)(1) event.  For all the above reasons, Lehigh also has not established an event not listed in § 2802(c) as a result of which termination is reasonable pursuant to § 2802(b)(2)(C).

This Court also finds unpersuasive Lehigh's argument that allowing BEI to insulate itself by

hiding behind Singh's fraudulent conduct while simultaneously benefitting from such conduct violates public policy.  BEI did not ultimately benefit from Singh's conduct, as BEI offered to return any overcompensation, and Lehigh in fact quickly recouped whatever losses it determined arose from the misreporting.  Also, termination of the franchise is not the only mechanism by which Lehigh can vindicate its rights, as its counterclaims and third-party claims demonstrate.  Furthermore, the PMPA "promote[s], if not mandate[s]" that a franchisor act "with great discretion, restraint and prudence in attempting to assure itself that there [is] some basis" for termination.  *Nassau Blvd. Shell Serv. Station*, 875 F.2d at 362 (citation omitted) (noting "[t]he practice of such discretion, restraint, and prudence goes a long way toward the prevention of arbitrary terminations").  Had Lehigh exercised more restraint and prudence in its investigation of BEI's ACME program reporting by first asking Patel about the inconsistencies, it could have learned the misreporting was done without Patel's knowledge before it issued the notice of termination.  Accordingly, and for the above reasons, Lehigh's termination of BEI's franchise is not lawful under the PMPA, and judgment will be entered in BEI's favor.

Lehigh asserts several state law claims against BEI, Patel, and Singh.  Lehigh's ejectment claim against BEI and Patel is dismissed because it is preempted by § 2806 of the PMPA.  *See* 15 U.S.C. § 2806(a)(1) (providing no state may enforce a law with respect to terminating a PMPA franchise unless it is the same as the applicable provisions of the PMPA).  Lehigh's claim for contribution and indemnification against Patel is dismissed because the franchise agreement does not provide indemnification to Lehigh for Lehigh's violations of the PMPA.  *See* Franchise Agreement 18.1-18.8.

Lehigh also asserts fraudulent misrepresentation and conversion claims against BEI, Patel,

20

and Singh.  The elements of a fraudulent misrepresentation claim are: "(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result." *Martin v. Lancaster Battery Co.*, 606 A.2d 444, 448 (Pa. 1992) (citation omitted).  Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n.3 (Pa. Super. Ct. 2000) (quoting *Stevenson v. Econ. Bank of Ambridge*, 97 A.2d 721, 726 (Pa. 1964)).

For the reasons already discussed, these claims are dismissed as to Patel.  Lehigh has, however, established these claims against Singh.  Singh admitted he completed the recap sheets knowing the values of the sales were incorrect and knowing Lehigh would reimburse BEI based on those values.  Under Pennsylvania law, BEI is also liable for these torts as Singh's principal because Singh completed the recap sheets in the scope of his employment.  *See Aiello v. Ed Saxe Real Estate, Inc.*, 499 A.2d 282, 285 (Pa. 1985) ("[A] principal is liable to third parties for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances and misfeasances of his agent committed within the scope of his employment even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment.").  Because Lehigh fully recovered the money it could show was unduly reimbursed to BEI, however, there is no financial loss on these claims.

Finally, Lehigh asserts a breach of contract claim against BEI, as the party with whom it contracted, and Patel, as a personal guarantor of BEI's obligations under the Franchise Agreement.

21

*See* Franchise Agreement 4.3(g).  Although this Court finds Lehigh has not established a breach of the Franchise Agreement justifying termination under the PMPA, and although any provable loss from the ACME program misreporting has been fully recovered by Lehigh, the misreporting is still a technical breach.  *See McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010) (providing the elements of a breach of contract claim are the existence of a contract, a breach of that contract, and damages arising from the breach).

Therefore, judgment is entered in favor of Lehigh and against BEI and Singh, but not Patel, on Lehigh's fraudulent misrepresentation and conversion claims, and judgment is entered in favor of Lehigh and against BEI and Patel on Lehigh's breach of contract claim.  Because Lehigh has not established monetary losses on these claims, only nominal damages will be awarded.  *See Stevenson*, 197 A.2d at 727 (holding plaintiff who establishes cause of action for conversion but has not established compensatory damages is entitled to nominal damages); *Freedom Oil Works Co. v. Williams*, 152 A. 741, 743 (Pa. 1930) (noting plaintiff is entitled to at least nominal damages where defendant admits breach of the contract); *Peerless Wall & Window Coverings, Inc. v. Synchronics, Inc.*, 85 F. Supp. 2d 519, 536 (W.D. Pa. 2000) (denying dismissal of fraud claim because "[u]nder Pennsylvania authority, nominal damages are available as a remedy for fraud").

An appropriate judgment follows.

BY THE COURT:


 /s/   Juan R. Sánchez
Juan R. Sánchez, J.